IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN RE:                                    :
NETFAX, INC.,                             :
        Debtor                         :
                                          :
MATSUDA CAPITAL, INC.,                    :
        Appellant                      :
                                          :
                                          :
        v.                             :    CIVIL NO. AMD 05-762
                                          :
NETFAX DEVELOPMENT, LLC, and              :
JOSEPH J. BELLINGER,                      :    APPEAL FROM BANKRUPTCY
TRUSTEE,                                  :    CASE NO. 02-57777-SD
        Appellees                      :

...o0o...

## MEMORANDUM OPINION

This is an appeal from an order of the bankruptcy court. Subject matter jurisdiction is appropriate under 28 U.S.C. § 158(c)(1). Appellant Matsuda Capital, Inc. ("Matsuda"), a secured creditor of Netfax, Inc. ("Debtor"), seeks reversal of the bankruptcy court's order authorizing the Chapter 7 Trustee, appellee Joseph J. Bellinger, to sell intellectual property of the Debtor to appellee Netfax Development, LLC ("NFD") free and clear of all liens, claims, and encumbrances, pursuant to 11 U.S.C. § 363(f)(3). No hearing is necessary. Fed.R.Bankr.P. 8012; Local Rule 105.6 (D. Md. 2004). The order of the bankruptcy court shall be affirmed.

I.

On May 14, 2002, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The bankruptcy court converted the case to a Chapter 7 proceeding,

on Debtor's request, on June 21, 2002. Joseph J. Bellinger ("Trustee") was appointed trustee for the bankruptcy estate.

Debtor owns intellectual property ("IP"), including the Internet Global Area Networks Fax System patent, U.S. Patent Number 6,028,679 ("the '679 patent"), and related rights to technology for secure Internet faxing capabilities. Debtor has filed applications with the United States Patent and Trademark Office for technologies related to the core technology described in the '679 patent.

On or about April 6, 2004, the Trustee filed a motion for authority to sell the IP to Firstin, Inc. ("Firstin"). The terms of the proposed sale were, *inter alia*, that Firstin would pay $187,500 upon closing and 7.5% of the net operating revenues generated through the future licensing of the IP. The Trustee proposed to sell the IP subject to all pre-petition secured claims and free and clear of post-petition secured claims. Like appellant Matsuda, Firstin is owned and controlled by the same individual, Philip Scutieri. Matsuda did not object to this initial proposal by the Trustee.

Subsequently, appellee NFD submitted a competing bid to purchase the IP. The Trustee, changing course upon consideration of the NFD bid, filed a conditional motion for authority to sell the IP to NFD on September 1, 2004. Under the terms of the bid, NFD would make a cash payment of $237,500 and assign to the Trustee a 12.5% interest in future net operating revenues. Matsuda objected to the proposed sale of the IP to NFD.

The bankruptcy court held six days of hearings (the "Sale Hearing") during

September, October, and November 2004. In the course of the Sale Hearing, Firstin and

NFD revised their bids.[1] Firstin's final offer provided for a cash payment of $237,500, plus

payment of 20% of net operating revenues. NFD's final offer provided for a cash payment

of $250,000, plus payment of 20% of net operating revenues.

    The Trustee testified that there were four groups of secured claims against the IP: (1)

Matsuda's secured claim of "$3.3 million;"[2] (2) secured claims totaling "$4.3 million" for

which financing statements were filed more than 90 days but less than one year before the

petition date;[3] (3) Thorp Reed & Armstrong's secured claim of "$40,000;" and (4) secured

claims totaling $1.2 million for which financing statements were not filed. R. Doc. 292 at

44. The bankruptcy court, summing the claims, concluded that the total amount of the

secured liens asserted against the IP was "$8.84 or 8.94, but under 9 million dollars." *Id*. at

91. The court found the fourth group of claims-- "1.2 million of that 9 million" – to consist

of liens that are "defective on their face." *Id*.

    The bankruptcy court found and concluded that the "purchase price" of the IP

included the cash payment and the promise to pay a portion of the future revenue stream

from net operating revenues. *Id*. at 90. The court stated:

---

[1]Two other parties made offers to purchase the IP but withdrew their bids before the end of the Sale Hearing.

[2]The court noted that $5.161 million dollars was the amount of Matsuda's claim "as filed." R. Doc. 292 at 90. In a 2003 offer to purchase the IP, Matsuda stipulated to a reduction of the claim to $3,366,749. R. Doc. 283 at 20-21.

[3]These claimholders are members of NFD and consented to the sale to NFD free and clear of their liens.

[W]hen I look at the fact that this asset is a unique asset, that its value is in a future revenue stream no matter who has the asset, and that the sale is structured and the offers have come in, and that it makes sense that this unusual asset should be sold as part of a future revenue stream to realize the value of the asset. And that's the way the asset would be paid for if we're going to recognize the value of the asset because it's of unusual nature.

It seems to me the purchase price is the down payment plus the future revenue stream.

*Id*. at 89-90.

Furthermore, NFD, Firstin, and the Trustee agreed that it was reasonable to project net operating revenues of $50 to 100 million, and indeed, the court found $50 to 60 million to be a "conservative" projection of net operating revenues. *Id*. at 91. Thus, 20% of net operating revenues would be at least $10 million, more than the sum of the secured claims.

To satisfy the requirements of 11 U.S.C. § 363(f)(3), which permits a trustee to sell property "free and clear" of any interest in such property of an entity other than the estate, the aggregate value of all liens on the property must be less than the sale price of the property.[4] The bankruptcy court concluded that § 363(f)(3) was satisfied because the

---

[4]Section 363(f) provides as follows:
> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>> (2) such entity consents;
>> (3) *such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property*;
>> (4) such interest is in bona fide dispute; or
>> (5) such entity could be compelled, in a legal or

(continued...)

purchase price-- at least $10 million plus the cash payment-- was enough to pay off all liens. In overruling Matsuda's objection that the terms of the proposed sale failed to satisfy the requirements of § 363(f)(3), the court stated as follows:

> So that it seems to me that the objection will be overruled because whether we deal with value of the claims, namely being paid off at 100 percent based on the projections, or whether we deal with the face amount of the claims being paid off 100 percent of the projections.
>
> Either way, under either theory of the law as it exists, it'll be covered by the price that this property --the Trustee is recommending that this property be sold for and is under the price that's being offered as part of this . . . 363(f) sale free and clear.
>
> And, therefore, the objection will be overruled because 363(f)(3) is satisfied.

*Id*. at 91-92.

The Trustee determined that NFD submitted the highest and best offer for the purchase of the IP and provided the best chance of recovery for the estate. The bankruptcy court concluded that the Trustee's determination that the NFD bid was the highest and best offer was a reasonable exercise of the Trustee's business judgment and approved the sale to NFD. *Id*. at 144.

The bankruptcy court's decision to accept the recommendation of the Trustee and approve the sale to NFD was based on a number of factors. First, the court observed that the purchase prices offered by the two competing bidders were essentially equal. The court

---

[4](...continued)
                    equitable proceeding, to accept a money satisfaction
                    of such interest.
11 U.S.C. § 363(f)(3)(emphasis added).

stated that the initial cash payment, "while slightly larger [$250,000 vs. $237,500] on the

Netfax Development bid, is basically the same, in the same ballpark" as the cash payment

offered by Firstin. *Id*. at 135.

Second, the court observed that the NFD team of professionals had secured the

services of the inventor of the IP, who had agreed to an assignment to NFD of any his

ownership claims. The court found this factor critical in assessing "the likelihood of the

future performance and the timeliness of the future performance in achieving revenue

streams promptly rather than in a delayed fashion." *Id*. The court stated:

> They [NFD] also eliminate inventor opposition in the sense that the inventor
> is asserting ownership claims that could cloud the ability to realize on the
> licensing agreement until resolved.
>
> The Netfax Development agreement has eliminated that issue by tying up and
> committing the inventor's support through an assignment of any ownership
> claims, while the Firstin bidders would leave that to be resolved in the future
> based on the owner's willingness to work with them rather than to litigate
> against them.

*Id*. at 136.

Third, the court compared the bidders' respective business plans and teams of

professionals and concluded that NFD had a "sounder approach" and "ha[d] assembled an

impressive team of professional support and a business support with a defined game plan."

*Id*. at 136-37. The Firstin plan, according to the court, was "not as firmly conceptualized in

detail." *Id*. at 138. The court described the business plans as follows:

> The approach of the recommended bidder, Netfax Development, is to focus
> on a strong assertive program to compel licensing and to compel the recovery

of damages for infringement by starting out with a focus on an expectation of prompt litigation to establish rights with a fallback of negotiations. If --or with the hopeful step back when negotiations will be, thus, encouraged.

The approach of the Firstin Group is to solidify claims in the Patent Office first, to approach negotiation second, and to organize the litigation strategy third. And that's reflected in the way they have put their --their teams together, and the emphasis thereof.

From what I've heard from the testimony, the negotiation approach that [the Debtor] has attempted in the past has failed completely, and that it needs a more forceful approach going forward in the future, and that the Trustee's judgment that the business plan offered by Netfax Development is . . . a sounder approach to the situation.

* * *

I cannot disagree with the Trustee's conclusion that it's probably better to go about it in a forceful fashion at an early time rather than going the more conservative route, which in the broader picture sounds like a more responsible business approach, but is limited by the notable lack of success that [the Debtor] has had in the past in utilizing that approach.

*Id*. at 136-38. According to the court, the NFD team's approach was more likely to generate revenues "with a degree of certainty" and "in the near future." *Id*. at 138.

Fourth, the court compared the two bids on the question of capitalization. The court noted that "the demonstrated financial commitment to date to spending actual dollars favors the Firstin bid" and that Scutieri, Firstin's principal, had the financial resources to support Firstin's plan. *Id*. at 139. The court also noted that NFD, while lacking significant financial resources, had secured a commitment of one million dollars from an investor. The court concluded that NFD, although "weaker in this area," possesses the financial resources to go forward with its plan. *Id*. at 140.

Fifth, the court discussed the issue of "incentive," phrasing the issue as follows:

> [T]he ultimate issue here, since the ultimate purchase price will depend on future performance, is who has the incentive to stay with the program longer as the going gets tough.

*Id*. at 140-41. The court found that Firstin's principal "ultimately is a businessperson who's going to be making on a strictly business judgment when to . . . invest more or when to cut and run." *Id*. at 141. The court decided that the individuals comprising NFD, on the other hand, have a couple of incentives to stay with the program, namely: (1) those individuals, as creditors of the Debtor, would want to recover previously invested time and money, and (2) those individuals will have to acquire third-party investors to whom they will owe a fiduciary duty to carry out their business plan. *Id*. at 142. The court concluded that NFD has the greater incentive "to follow through on the program." *Id*. at 143.

Finally, the court considered that, if the Firstin program were carried out, money would go to equity. It was the court's opinion, however, that distributing money to equity "is a subordinated factor" and "comes last in line." *Id*.

The court stated, in conclusion, that "the most important factor is the likelihood that we will generate, and the certainty that we will generate within a reasonable time, a recovery for the creditors, and to pay the creditors in full." *Id*. at 143-44. The court approved the Trustee's recommended acceptance of the NFD bid based on all of the above factors. The court's order ("Sale Order"), entered December 2, 2004, authorized the Trustee to sell the bankruptcy estate's interest in the IP to NFD free and clear of all liens, claims, and

encumbrances, and provided that, if NFD is unable to close on the sale, the Trustee is authorized to sell the property to Firstin. R. Doc. 281.

Matsuda and Firstin filed motions seeking reconsideration of the Sale Order. The court denied both motions, but stayed implementation of the Sale Order pending appeal to this court. Matsuda timely noted its appeal.

## II.

Matsuda's primary argument is that the bankruptcy court's approval of the sale of the IP free and clear of liens failed to satisfy the requirement of § 363(f)(3) that the purchase price exceed the aggregate value of all liens on the property. Specifically, Matsuda argues that the court, by permitting the payment of secured claims through a future revenue stream, tacitly applied an "economic value" approach to § 363(f)(3) lien satisfaction, and, in doing so, erred as a matter of law. Matsuda also argues that the court erred as a matter of law in approving the sale without requiring that Matsuda's claim be paid in full at the time of closing. Matsuda further contends that it submitted a valid credit bid for the purchase of the IP, pursuant to § 363(k),[5] and the court's failure to consider such bid was error.

---

[5]Section 363(k) of the Bankruptcy Code provides as follows:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

Appellees NFD and the Trustee argue that the bankruptcy court correctly concluded that, regardless whether one applies the so-called "face value" approach or the "economic value" approach, the approved purchase price exceeds the value of all asserted secured claims. Appellees also contend that there is no legal support for Matsuda's argument that the entire purchase price must be paid in cash at the closing. Appellees dispute Matsuda's assertion that it submitted a credit bid. NFD further argues that, assuming *arguendo* that Matsuda had made a viable credit bid, such a credit bid was inappropriate and the evidence supports the bankruptcy court's conclusion that the sale to NFD is in the best interest of the estate.

III.

On appeal, district courts review bankruptcy courts' factual findings for clear error, and their conclusions of law under the *de novo* standard. *In re Kielisch*, 258 F.3d 315, 319 (4th Cir. 2001); *In re Deutchmann*, 192 F.3d 457, 459 (4th Cir. 1999). An abuse of discretion standard applies in the review of a bankruptcy court's ultimate application of law to fact. "An abuse of discretion exists where the [lower court's] decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 470 (3d Cir. 1998) (quoting *ACLU v. Black Horse Pike Reg'l Bd. of Educ.,* 84 F.3d 1471, 1476 (3d Cir. 1996) (internal quotation omitted)).

Although appellant and appellees frame the issues differently, the dispositive issue

on appeal is whether, in light of the deferred nature of most of the payments constituting the

purchase price of the IP, and the lack of certainty concerning the monetization of the IP, the

bankruptcy court abused its discretion in determining that the sale of the intellectual property

to NFD satisfies the requirement of § 363(f)(3). A secondary issue is whether the bankruptcy

court abused its discretion in not considering a credit bid from Matsuda.

IV.

Section 363(f)(3) of the Bankruptcy Code permits a trustee to sell property "free and

clear" of any interest in such property of an entity other than the estate if "such interest is a

lien and the price at which such property is to be sold is greater than the aggregate value of

all liens on such property." 11 U.S.C. § 363(f)(3). Courts have disagreed on the meaning of

"value" in this context. Some courts have interpreted the word "value" in §363(f)(3) to mean

the "economic" or fair market value of the property securing the claim. *See, e.g., In re Beker*

*Indus. Corp.*, 63 B.R. 474, 475-78 (Bankr. S.D.N.Y. 1986). Other courts have interpreted

the word "value" to mean the "face value" or actual amount of the claim secured by the lien.

*See, e.g., In re Canonigo*, 276 B.R. 257, 260-64 (N.D. Cal. 2002). Matsuda contends that the

bankruptcy court erred because it applied the former definition rather than the latter.

In reviewing the pertinent case law and commentary, the *Canonigo* court observed

that "[l]eading bankruptcy law treatises appear to favor the ['face amount' approach]," while

"a majority of the courts that have confronted the issue have adopted the 'economic value

of the lien' approach." *Id*. at 260. In deciding to adopt the minority view that "the aggregate

value of all liens" means the face amount of the claims secured by the liens, the court

reasoned in part as follows:

> Although the word "value" is ambiguous, as used in section 363(f)(3), the
> word "greater" is not. Assuming the sale price determines the value of the
> property to be sold, the sale price for overencumbered property can never be
> *greater* than the aggregate economic value of the liens on the property. For
> example, if property encumbered by a senior lien securing a debt of $75,000
> and a junior lien securing a debt of $50,000 is proposed to be sold for
> $100,000, the aggregate economic value of the liens is $100,000. If someone
> overbids and proposes to buy the property for $125,000, the aggregate
> economic value of the liens would increase to $125,000.

> *The only way the sale price could be greater than the aggregate economic*
> *value of the liens is if the sale price also exceeded the face amount of the*
> *claims secured by the liens.* For example, if the property were sold for
> $150,000, the aggregate economic value of the liens would still only be
> $125,000. As a consequence, the Court has no choice but to adopt the minority
> view: i.e., that the phrase "the aggregate value of the liens" means the full face
> amount of the claims secured by the liens.

*Id*. at 262-63 (second emphasis added). *See also In re WDH Howell, LLC*, 298 B.R. 527, 532

(D. N.J. 2003) (stating that "value in § 363(f) cannot mean economic value if it is read in the

context of the preceding term 'greater than'").

Although the *Canonigo* court, in rejecting the "economic value" approach, assumed

that the economic value of the liens is equivalent to the purchase price of the property, other

courts have not made this assumption. The *Beker* court, for example, considering the

"interplay" of § 363(f)(3) and § 506(a) of the Bankruptcy Code, concluded that "value" in

§ 363(f)(3) means the valuation of the property as determined by the bankruptcy court. The

court stated:

[T]he term "value," as used in § 506(a) with respect to the interest of a secured

-12-

creditor, means *its actual value as determined by the Court*, as distinguished from the amount of the lien. That indication and the last sentence of § 506(a) requiring determination of value upon disposition of an asset standing as collateral strongly support the conclusion that the term "value," as employed in § 363(f)(3) is to be similarly interpreted.

*Beker*, 63 B.R. at 476 (emphasis added).

For the purpose of this appeal, it is unnecessary for this court to decide whether the phrase, "aggregate value of all liens," refers to the face amount of the secured claims or the economic value of the property supporting the liens. The bankruptcy court applied *both* approaches and did not err in concluding that the purchase price exceeds both the face value and economic value of the liens. The court stated:

[W]hether we deal with value of the claims, namely being paid off at 100 percent based on the projections, or whether we deal with the face amount of the claims being paid off 100 percent of the projections.

Either way, under either theory of the law as it exists, it'll be covered by the price that this property – the Trustee is recommending that this property be sold for and is under the price that's being offered as part of this . . . 363(f) sale free and clear.

R. Doc. 292 at 91.

Each of the competing bids was structured to consist of a cash payment plus a percentage of the future revenue stream to be generated from the IP. The parties agreed that a reasonable projection of future net operating revenues is $50 to 100 million. The court made a factual finding that a conservative estimate of net operating revenues is $50 to 60 million. Matsuda does not contend, and this court does not conclude, that such an estimate is clearly erroneous. As each of the bids assigned to the Trustee 20% of net operating

-13-

revenues, the court correctly noted that, according to its projection of the amount of future net operating revenues, the ultimate purchase price of the IP would be at least $10 million plus the cash down payment.

The court did not err, plainly or otherwise, in finding that the purchase price of the IP is greater than the face amount of the secured claims. The secured claims consist of a group of claims totaling approximately $4.3 million, a claim of $40,000, and Matsuda's claim. Whether Matsuda's claim is $3,366,749 or $5,161,251.88, *see supra* note 2, the purchase price of more than $10 million is greater than the aggregate value of all of the liens.

Nor did the court err in finding that the purchase price of the IP is greater than the economic value of the secured claims. Although the court did not state what it determined to be the exact "value" of the secured claims, the court ruled that "whether we deal with value of the claims, namely being paid off at 100 percent based on the projections . . . [that amount] is under the price that's being offered." R. Doc. 292 at 91. It is implicit in this ruling that the purchase price is greater than what the court determined to be the economic value of the claims. This court concludes that the bankruptcy court's implicit valuation of the liens as less than the purchase price is not clearly erroneous.

Matsuda also argues that the court's approval of the sale is a *de facto* application of the economic value approach to lien satisfaction under § 363(f)(3) because, according to Matsuda, the court found that the "value" of Matsuda's lien would be determined by the amount of payments provided by NFD. To the contrary, the record shows that the

-14-

bankruptcy court made no such finding. As discussed *supra*, the court stated that the purchase price, "based on the projections," would be adequate to pay 100% of the claims' value. *Id*. This value, although not made explicit by the bankruptcy court, did not depend on, and was not determined by, the future revenue stream.

In essence, Matsuda objects to the bankruptcy court's approval of a sale in which the full payment of the purchase price of the property will not occur at the closing of the sale and the bulk of the purchase price will be paid from what Matsuda considers to be a "contingent and speculative revenue stream." Matsuda argues that the bankruptcy court's approval of a sale structured in this way violates § 363(f)(3). There is no explicit requirement in § 363(f)(3) that lienholders be paid in full upon the closing of a sale conducted pursuant to that provision, and there is no case law to support Matsuda's argument. It is not persuasive and this court rejects it.

V.

Matsuda also contends that it submitted a valid credit bid for the purchase of the IP and that the bankruptcy court's failure to consider such bid is an error of law. The record belies this contention.

Halfway through the Sale Hearing, Matsuda's counsel stated that, if the court overruled Matsuda's § 363(f) objection, Matsuda would be substituted for Firstin as the proposed purchaser and would submit a credit bid. R. Doc. 283 at 8-9. Counsel for NFD argued that a credit bid would be "entirely inappropriate" under the circumstances and

suggested to the court that the issue of credit bidding be taken up at the end of the hearing after all evidence had been presented. *Id*. at 11. On the final day of the Sale Hearing, the court requested clarification as to whether Matsuda was a bidder. The Trustee clarified that Matsuda had not been substituted for Firstin and that "Firstin is still the bidder under the sale motion." R. Doc. 292 at 15. During his closing argument, Matsuda's counsel did not revisit the possibility of Matsuda being substituted for Firstin. In its order denying Matsuda's motion for reconsideration of the Sale Order, the bankruptcy court wrote: "The court did not rule on a Matsuda bid that was separate from the Firstin bid. Matsuda was either to be substituted for Firstin or not, and the court was not advised a substitution had occurred." R. Doc. 316. This court concludes that the bankruptcy court did not abuse its discretion in not considering a credit bid from Matsuda.

VI.

For the reasons set forth herein, the bankruptcy court's order authorizing the Trustee to sell intellectual property of the Debtor to NFD free and clear of liens is AFFIRMED.


Filed: August 1, 2005                                   _____/s/_____
                                                        Andre M. Davis
                                                        United States District Judge